**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CARLOS SEBASTIAN ZAPATA RIVERA,<br>    Plaintiff,<br><br>v.<br><br>DAVID JACKSON, Acting Supervisory Detention<br>and Deportation Officer, U.S. Immigration and<br>Customs Enforcement,<br><br>    Defendant. | C.A. No. 25-13850-MRG |

## AMENDED COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. Squeezing the neck to stop blood flow to the brain is dangerous. The U.S. Department of Homeland Security ("DHS") rightly classifies this action—often referred to as chokehold and carotid restraints—as a form of deadly force. It prohibits its agents from using this technique unless deadly force is authorized.

2. Yet on November 6, 2025, Defendant David Jackson, a federal agent employed within DHS, strangled Plaintiff Carlos Sebastian Zapata Rivera unconscious in the front seat of a car while arresting him in Fitchburg, Massachusetts.  Carlos did not present a threat to the agent or to any other person. In the wake of Agent Jackson's violent actions, Carlos has suffered lasting harms, as described below.

3. Agent Jackson's conduct violated not only his department's own policies, but also the U.S. Constitution's prohibition on the use of unreasonable and excessive force in the arrest process.  This Complaint is brought against Agent Jackson for his wrongful and unconstitutional actions.

**THE PARTIES**

4.  Plaintiff Carlos Sebastian Zapata Rivera resides in Fitchburg, Massachusetts, with his wife Juliana Milena Ojeda Montoya.  They reside together with their daughter, referred to herein by the pseudonym "A.Z.O."  At the time of Carlos's arrest described herein, A.Z.O. was one year old.

5.  Defendant David Jackson was at all relevant times a federal agent employed as an Acting Supervisory Detention and Deportation Officer ("(A)SDDO") within U.S. Immigration and Customs Enforcement ("ICE").  ICE is an agency of the United States government and a component of DHS.  Upon information and belief, Agent Jackson was at all relevant times acting under color of legal authority on behalf of the United States government.  He is sued in his individual capacity.

**JURISDICTION AND VENUE**

6.  This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

7.  Venue is proper in the United States District Court for the District of Massachusetts under 28 U.S.C. § 1391(b) & (e), including because a substantial part of the events or omissions giving rise to the claim occurred in this district and because Carlos resides in this district.

**FACTS**

A.  *Carlos resides in Fitchburg, Massachusetts, with his wife and their child.*

8.  Carlos was born in Ecuador.  In Ecuador, he completed high school, worked, and trained to be a police officer.

9.  Carlos later traveled to the United States.  In February 2023, he was arrested inside the United States by Border Patrol agents and placed in Removal Proceedings.  The

immigration authorities released him and ordered him to appear in the Immigration Court in Boston to continue those proceedings.

10. Carlos has appeared for all required proceedings in the Immigration Court. As part of those proceedings, he filed an application for asylum in early 2024. That application is currently pending, and his proceedings are ongoing.

11. When Carlos was released from immigration custody in 2023, he was ordered to appear for an in-person "check-in" with immigration authorities when he arrived in Massachusetts. Carlos appeared for the check-in in Massachusetts as ordered in or around February 2023. From in or around February 2023 through the end of November 2025 (a period of roughly two and half years), the immigration authorities never asked Carlos to appear for another check-in.

12. While Carlos's immigration proceedings have been pending, the U.S. government authorized him to work in the United States. He has been lawfully employed to support himself and his family.

13. Carlos has no criminal record.

14. Carlos resides in Fitchburg, Massachusetts, with his wife Juliana and their daughter A.Z.O.

15. A.Z.O. is a United States citizen and was one year old in November 2025. (She has subsequently turned two.)

B. *The Carotid Restraint Is a Dangerous Form of Strangulation and Is Prohibited by DHS Except in Circumstances Where Use of Deadly Force Is Justified.*

16. Pressure on the neck may cause incapacitation and loss of consciousness in essentially two ways. First, pressure on the airway restricts the flow of air to the lungs. And second, pressure on the sides of the neck compresses the blood vessels of the neck and restricts flow of blood to the brain.

17. Placing pressure on the neck in these ways is a form of strangulation. *See, e.g.*, M.G.L. Ch. 265, Section 15D (defining the crime of "Strangulation" as "the intentional interference of the normal breathing or circulation of blood by applying substantial pressure on the throat or neck of another"); 18 U.S.C. § 113(b)(4) (defining the crime of "strangling" as "intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of a person by applying pressure to the throat or neck, regardless of whether that conduct results in any visible injury or whether there is any intent to kill or protractedly injure the victim").

18. Applying pressure to the sides of the neck to restrict the blood supply to the brain is also sometimes referred to as a "carotid restraint." *See, e.g.*, "Update to the Department Policy on the Use of Force," Policy Statement 044-05 (Rev. 01), U.S. Department of Homeland Security (Feb. 6, 2023)[1] at Sec. XII(B) ("The carotid restraint technique restricts blood flow to the brain causing temporary unconsciousness.").

19. The term "carotid restraint" refers to the compression of the carotid arteries. The carotid arteries are blood vessels that transport blood from the heart to the brain via the neck. They are located on each side of the neck, in approximately the position shown in Figure 1, below.

---

[1] Available at: https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf



*Figure 1: Diagram showing the carotid arteries in the neck, depicted in red [2]*

20. Approximately 70% of the blood supply to the brain flows through the carotid arteries.[3]

21. A force of only six kilograms (about 13 pounds) is necessary to compress the carotid arteries in the neck.[4]

22. Interruption of blood supply to the brain for as little as four seconds can result in loss of consciousness.[5]

23. Carotid restraints are very dangerous.  They may cause damage to the brain, stroke, seizure, cardiac arrhythmia, and damage to the blood vessels of the neck, among other things.  They may also cause death.[6]

---

[2] Source: "Carotid Arteries," Introduction to Health Assessment for the Nursing Professional – Part 1 (Toronto Metropolitan University Press 2021).

[3] Jillian M. Berkman, MD, Joseph A. Rosenthal, MD, PhD, Altaf Saadi, MD, MSc, "Carotid Physiology and Neck Restraints in Law Enforcement: Why Neurologists Need to Make Their Voices Heard," 78 JAMA Neurology 267, 267 (2021).

[4] *Id.*

[5] *Id.*

[6] *Id.*

24. As three neurologists affiliated with Mass General Brigham and Harvard Medical School recently explained: "[T]he implication that there is a safe way for law enforcement to restrain using carotid manipulation, or traumatic manipulation of cerebral blood flow in any form, is simply false. Carotid compression contributes to potential neurologic sequelae via oxygen deprivation, embolic risk from mechanical vessel wall trauma, or arrhythmia. The possibility of devastating repercussions is too high to merit the use of neck restraints in any circumstance."[7]

25. In 2021, the American Academy of Neurology (the "AAN"), the world's largest association of neurologists and neuroscience professionals, issued a position statement on the use of neck restraints by law enforcement, including carotid restraints. The AAN explained that "[u]nconsciousness resulting from such maneuvers is a manifestation of catastrophic global brain dysfunction," and "strongly encourage[d] federal, state, and local law enforcement and policymakers in all jurisdictions to classify neck restraints, at a minimum, as a form of deadly force."[8]

26. ICE and DHS have, in fact, long classified strangulation techniques, including carotid restraints, as a form of deadly force that may only be used when deadly force would be justified.

27. For example:

    a. In 2008, ICE issued Performance-Based National Detention Standards that stated: "The following acts and techniques are specifically prohibited: 1. Choke holds,

---

[7] *Id.*

[8] "AAN Position Statement on the Use of Neck Restraints in Law Enforcement," American Academy of Neurology (June 9, 2021), https://www.aan.com/advocacy/use-of-neck-restraints-position-statement#:~:text=Because%20of%20the%20inherently%20dangerous,a%20form%20of%20deadly%20force.

carotid control holds, and other neck restraints . . . ."  *See* "Use of Force and Restraints," ICE/DRO Detention Standard (Dec. 2, 2008).[9]

b.  In 2016, ICE issued revised Performance-Based National Detention Standards that stated: "The following acts and techniques are specifically prohibited, unless deadly force would be authorized: 1. Choke holds, carotid control holds and other neck restraints . . . ."  *See* "Use of Force and Restraints," ICE Performance Based National Detention Standards (Dec. 2016).[10]

c.  In 2018, DHS issued a "Department Policy on the Use of Force," which defines "Deadly Force" as "[a]ny use of force that carries a substantial risk of causing death or serious bodily injury," including "any strangulation technique."  *See* "Department Policy on the Use of Force," Policy Statement 044-05, U.S. Department of Homeland Security (Sept. 7, 2018)[11] at Sec. XI(A).

d.  In 2023, DHS issued an "Update to the Department Policy on the Use of Force," in which it ordered that "**Chokeholds and carotid restraints are prohibited unless deadly force is authorized . . . .  Chokeholds and carotid restraints must not be used as a means to control non-compliant subjects or persons resisting arrest**."  *See* "Update to the Department Policy on the Use of Force," Policy Statement 044-05 (Rev. 01), U.S. Department of Homeland Security (Feb. 6, 2023)[12] at Sec. III(C)(2) (emphasis added).

---

[9] Available at: https://www.ice.gov/doclib/dro/detention-standards/pdf/use_of_force_and_restraints.pdf

[10] Available at: https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf

[11] Available at: https://www.dhs.gov/sites/default/files/publications/mgmt/law-enforcement/mgmt-dir_044-05-department-policy-on-the-use-of-force.pdf

[12] Available at: https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf

e.  In 2023, ICE issued Directive 19009.3 on "Firearms and Use of Force," in which ICE defines deadly force to include "'any strangulation techniques, including chokeholds or carotid restraints.'" *See Chicago Headline Club v. Noem*, No. 25-12173, 2025 WL 3240782, at *12 (N.D. Ill. Nov. 20, 2025) (quoting ICE directive).

28. Nevertheless, in the last year, there have been multiple instances of ICE and Border Patrol agents apparently employing prohibited choking techniques, including carotid restraints. For example:

a.  During protests at ICE's Broadview facility in Illinois in 2025, ICE personnel "tackled protesters, placing some in headlocks or chokeholds." *See Chicago Headline Club*, 2025 WL 3240782, at *85.

b.  In November 2025, Border Patrol agents in North Carolina applied an apparent carotid restraint or other chokehold to an arrestee.[13] *See* Fig. 2.

c.  In December 2025, an ICE agent in Minneapolis applied an apparent carotid restraint or other chokehold to an arrestee who is reportedly a United States citizen.[14]

---

[13] Eduardo Medina & Meredith Honig, "*In North Carolina, the Border Patrol's Presence Divides a Swing State*," New York Times (Nov. 22, 2025), https://www.nytimes.com/2025/11/22/us/north-carolina-border-patrol-immigration-politics.html.

[14] Matt Sepic, "*ICE agents tackle, arrest American citizen in Minneapolis*," Minnesota Public Radio (Dec. 10, 2025), https://www.mprnews.org/story/2025/12/10/ice-agents-tackle-arrest-american-citizen-in-minneapolis; *see also* Emma Tucker, "*This US citizen went on his lunch break and ended up in a chokehold by masked federal agent and detained, video shows*," CNN (Dec. 13, 2025), https://www.cnn.com/2025/12/13/us/ice-minneapolis-us-citizen.



*Figure 2: Chokehold in North Carolina*
*(photo credited to Ryan Murphy/Getty Images)*

29. As further described below, Agent Jackson similarly subjected Carlos to a prohibited and unlawful carotid restraint when ICE agents stopped Carlos's car on November 6, 2025.  In Carlos's case, while other federal agents restrained his arms, Agent Jackson grasped Carlos's neck with both hands from the front and used his thumbs to compress Carlos's carotid arteries.  Agent Jackson continued this unlawful and prohibited carotid restraint even after Carlos lost consciousness and even after Carlos began to exhibit involuntary, seizure-like movements throughout his body.

C. *ICE Agent David Jackson Strangled Carlos Unconscious while Arresting Him During a Motor Vehicle Stop in Fitchburg, Massachusetts, on the Morning of November 6, 2025.*

30. On the morning of November 6, 2025, Carlos was driving Juliana to work from their home in Fitchburg, Massachusetts.

31. Carlos was sitting in the driver's seat of the car.  Juliana was in the front passenger seat. When they left home, their then-one-year-old daughter A.Z.O. was in a car seat in the back seat of the car.

32. Shortly after they left their home, a group of ICE agents, together with other federal agents working on behalf of ICE (collectively, the "ICE arrest team"), activated their lights behind Carlos's car.  On information and belief, the purpose of the stop was to arrest Juliana and place her in civil immigration custody.

33. Carlos pulled over to the side of the road on Kimball Street in Fitchburg, Massachusetts.

34. The ICE arrest team positioned their cars to block in Carlos's car, such that he could not drive away.

35. Members of the ICE arrest team approached Carlos's car and began banging on the windows.

36. At or around this time, A.Z.O. began crying in the back seat, and Juliana brought A.Z.O into the front seat to comfort her.  As a result, A.Z.O. moved into the front seat of the parked car, between Carlos and Juliana.

37. Carlos rolled down his window so that he could speak with the agents.

38. Juliana rolled down her window so she could speak with the agents, as well.

39. An ICE agent ordered Juliana to open her door, and she complied with that order and opened the door.

40. During the course of the stop, an ICE agent informed Juliana that ICE intended to arrest her.

41. Juliana informed members of the ICE arrest team that she intended to comply, but first wanted to call her attorney to confirm what was happening, or words to that effect.

10

42. The members of the ICE arrest team did not allow Juliana to contact her attorney. Instead, the members of the ICE arrest team began making threats that they would arrest both Juliana and Carlos, that their child A.Z.O. would be placed in state custody, and that they would never see their child A.Z.O. again.

43. At various times during the stop, members of the ICE arrest team physically grabbed A.Z.O. inside the car.

44. Carlos and Juliana were terrified that they would be permanently separated from their one-year-old child.

45. During the course of the stop, members of the ICE arrest team also opened the front and rear driver's side doors of the car. Members of the ICE arrest team climbed into the back seat behind Carlos, and also stood next to Carlos at the open door on the front driver's side. At various times, the agents behind and next to Carlos grabbed Carlos and used force against him, including as further described below.

46. During the course of the stop, a member of the ICE arrest team contacted Defendant Agent David Jackson. On information and belief, Agent Jackson was at that time an Acting Supervisory Detention and Deportation Officer with ICE and was, in fact, supervising the members of the ICE arrest team.

47. Agent Jackson traveled to the scene of the vehicle stop. Agent Jackson was wearing a blue face mask, backwards baseball cap, gray sweatshirt, black gloves, and a tactical vest marked "ERO". "ERO" is a commonly used acronym for ICE's Enforcement and Removal Operations division, which conducts civil immigration arrests. Agent Jackson's baseball cap was marked "ICE Fugitive Operations" with an apparent symbol of a white knight chess piece in front of crossed swords. On information and belief, the hat also bears the

11

Latin phrase "Ne Quis Effugiat," which translates roughly to "So That None Will Escape" or "Lest Anyone Escape."



*Figure 4: Agent Jackson from behind*

48. During the course of the stop, the ICE arrest team and Agent Jackson did, in fact, decide to arrest both Juliana and Carlos.

49. Members of the ICE arrest team in the back seat of the vehicle and at the front driver's side door restrained Carlos's arms.

50. At the same time, Agent Jackson asked the other agents "Are you guys good?  Are you guys ready?"  Agent Jackson then climbed in the front passenger's side door.  He positioned his body over Juliana and A.Z.O. so that he was within reach of Carlos's neck.

12



*Figure 5: Agent Jackson enters the passenger's side door and places himself over Juliana and A.Z.O., within reach of Carlos's neck.  In the second image, Agent Jackson is completely within the vehicle, except for his left foot.*

51. Agent David Jackson grabbed Carlos by the neck. Agent Jackson's fingers were on the sides of Carlos's neck.  Agent Jackson's thumbs were positioned on either side of the front of Carlos's neck, directly on his carotid arteries.  Agent Jackson pushed backwards very forcefully with his thumbs.  This had the effect of compressing Carlos's carotid arteries and restricting blood flow to Carlos's brain.

52. Agent David Jackson performed a carotid restraint on Carlos.

53. Carlos could not protect himself from the carotid restraint.  His arms were being restrained by federal agents in the back seat of the car and at the driver's side door.  He could not move his head and neck away because of the seat's headrest and the interior body of the car.

54. At the time Agent Jackson performed the carotid restraint on Carlos, and at all other relevant times, Carlos did not present a threat to the agents or to anyone else.

55. Agent Jackson's use of the carotid restraint on Carlos was unnecessary, unjustified, unreasonable, excessive, and grossly disproportionate to any conceivable government interest.

56. Agent Jackson's use of the carotid restraint on Carlos was contrary to DHS's and ICE's own use of force policies and their longstanding recognition that carotid restraints are a form of deadly force.

57. When Agent Jackson applied the carotid restraint to Carlos, Carlos's vision went black and then he lost consciousness.

58. At or around the time Carlos lost consciousness, his body experienced pronounced involuntary, seizure-like movements.

59. Agent Jackson continued to apply the carotid restraint with at least one hand even after Carlos began to experience the involuntary, seizure-like movements.



*Figure 6: Agent Jackson, wearing black gloves, applies the carotid restraint to Carlos*



*Figure 7: Carlos experiences involuntary, seizure-like movements, while A.Z.O screams*

60. Agent Jackson removed his hands from Carlos's neck and exited the car, as Carlos's involuntary movements continued.

61. Carlos's involuntary movements eventually ceased, and he regained consciousness. He felt confused and disoriented.

62. Agent Jackson walked to the open door on the front driver's side of the car, next to Carlos. Agent Jackson spoke to Carlos, including, on information and belief, threatening to break Carlos's arm and yelling repeatedly "OUT NOW."

63. Carlos exited the car. Agent Jackson instructed Carlos, "Put your hands behind your back." Agent Jackson and other members of the ICE arrest team placed Carlos under arrest, handcuffed him behind his back, walked him to a government car, and placed him in the rear of the car.

64. An ambulance with emergency medical services ("EMS") personnel had been called to the scene. EMS personnel with a gurney and other equipment were positioned in close proximity to the arrest. Carlos said he wanted to be evaluated by EMS. The federal agents walked him past the EMS personnel and equipment without allowing him to access medical attention. On information and belief, Agent Jackson waved EMS away and told them, "He's all good."

65. Once Juliana exited the car, the ICE arrest team placed her under arrest for civil immigration detention. The ICE arrest team drove Juliana directly to an immigration detention facility in Maine.

66. The ICE arrest team ultimately released Carlos at the scene. Carlos did not feel well enough to drive, and a third party drove Carlos and A.Z.O. home.

67. Late that afternoon, Carlos tried to go to work. When he arrived at work, he felt severe physical symptoms caused by the conduct of Agent Jackson and the other federal agents. Among other things, he experienced a sharp headache and pain in his arms, throat, and back.

68. Carlos left work and went to the emergency room, where he received evaluation and treatment for "injury due to physical assault," including "having been choked around the neck."

69. Carlos has subsequently continued to experience pain and other symptoms caused by Agent Jackson's conduct alleged herein, and has continued to receive medical evaluation and treatment for those symptoms.

70. As a direct and proximate result of Agent Jackson's unlawful and unconstitutional conduct, Carlos was harmed and caused to suffer significant damages, including physical pain and suffering, and emotional distress with resulting physical symptoms, including, but not limited to, sleeplessness, nightmares, anxiety, and fear.

D. *In the aftermath of the arrests, a federal judge ordered Juliana released, and DHS took steps to conceal its agent's unlawful conduct.*

71. After her arrest, Juliana filed a Petition for Writ of Habeas Corpus in the U.S. District Court for the District of Maine. The government initially claimed that her arrest had been required by the recently enacted Laken Riley Act, but later abandoned that assertion. A

federal judge ordered Juliana released on November 10, 2025.  *See generally Ojeda Montoya v. Joyce*, No. 25-558 (D. Me.).

72. In the meantime, the federal government has attempted to conceal its unlawful conduct towards Carlos.  Among other things, DHS made multiple false assertions in a public statement about the incident, including falsely asserting and/or implying that Carlos was "FAKING a seizure," "refused medical help," and "displayed absolutely no signs of medical concerns just moments later."  These statements were lies.

## COUNT I
### Bivens Claim for Violation of Fourth Amendment Rights
### Against Agent David Jackson (Individual Capacity)

73. Plaintiff repeats and incorporates by reference all preceding paragraphs of the Complaint as though they were fully set forth herein.

74. Carlos asserts a claim under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for the violation of his Fourth Amendment right to be free from unreasonable searches, seizures, and excessive force.

75. Agent David Jackson's conduct of the arrest and use of force against Carlos was excessive and unreasonable.

76. The actions of Agent Jackson as described herein violated Carlos's rights under the Fourth Amendment of the United States Constitution.

77. As a direct and proximate result thereof, Carlos was caused to suffer damages, including but not limited to actual damages, physical harm, fear, and severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendant, and hereby seeks the following relief:

1) Compensatory damages to fully and fairly compensate Plaintiff for his physical pain and suffering, emotional distress and mental anguish, and other harms and losses;

2) Punitive damages, to the extent available;

3) Reasonable attorney's fees and costs as permitted by law; and

4) Any other relief that the Court deems just and proper.

## **JURY DEMAND**

Plaintiff requests a trial by jury on all claims.

Respectfully submitted,

Carlos Sebastian Zapata Rivera ,
By His Attorneys,

*/s/ Daniel L. McFadden*
Jessie J. Rossman (BBO #670685)
Daniel L. McFadden (BBO #676612)
Ingrid Sydenstricker (BBO #718298)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
dmcfadden@aclum.org
isydenstricker@aclum.org

Ingrid S. Martin (BBO #653632)
Joseph M. Cacace (BBO #672298)
Todd & Weld, LLP
One Federal Street
Boston, Massachusetts 02110
(617) 720-2626
imartin@toddweld.com
jcacace@toddweld.com

DATED:        April 10, 2026

18