**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CARLOS SEBASTIAN ZAPATA RIVERA,

        Plaintiff,

v.

DAVID JACKSON, Acting Supervisory Detention
and Deportation Officer, U.S. Immigration and
Customs Enforcement,

        Defendant.

C.A. No. 25-13850-MRG

Leave to File Excess Pages
Granted July 1, 2026

**OPPOSITION TO MOTION TO DISMISS**

i

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................................ iv

LEGAL STANDARD ......................................................................................................... 1

FACTS ALLEGED .............................................................................................................. 1

1.  Carotid restraints are deadly force. ........................................................................ 2

2.  Agent Jackson used deadly force against Carlos while arresting him at a roadside vehicle stop in Fitchburg, Massachusetts, even though Carlos was restrained and presented no threat to Agent Jackson or any other person. ................................................................... 2

ARGUMENT ....................................................................................................................... 5

1.  Mr. Zapata Rivera may bring a *Bivens* claim against a federal agent who used excessive force while making an arrest inside the United States. ............................................. 5

    A.  The *Bivens* cause of action is a longstanding, robust, and necessary protection against federal agents' use of excessive force during domestic arrests in violation of the Fourth Amendment to the U.S. Constitution. ...................................................................... 6

    B.  The *Bivens* cause of action is available here because Mr. Zapata Rivera's claim of excessive force by a federal agent during an arrest inside the United States is squarely within the existing *Bivens* context for Fourth Amendment claims. ....................................... 9

        i.  This claim is not foreclosed by *Hernandez* and *Egbert*. ............................................ 10

        ii.  The fact that Agent Jackson works at a different federal law enforcement agency than the agents in *Bivens* does not preclude this claim. ...................................................... 11

        iii.  The *Bivens* claim is not foreclosed by any differences in the "statutory or other legal mandate". .................................................................................................................. 14

        iv.  The *Bivens* claim is not foreclosed by any "special factors". ............................... 15

    C.  Even if lawsuits against ICE agents for excessive force during an arrest inside the United States present a new context for *Bivens* purposes, the Court should recognize a *Bivens* claim in this context. .............................................................................................. 16

2.  Agent Jackson is not entitled to qualified immunity for strangling a restrained person unconscious without cause and in violation of his own agency's use of force rules. ................ 17

    A.  Because Agent Jackson used deadly force while Carlos presented no threat and was restrained, Carlos has sufficiently alleged a violation of the Fourth Amendment's prohibition on the use of excessive force. ............................................................................ 17

B.    Officer Jackson violated a clearly established right when he strangled Carlos unconscious....................................................................................................... 22

CONCLUSION........................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. City of Lowell*, 666 F. Supp. 3d 102 (D. Mass. 2023) ........................................................ 1

*Alvarez v. ICE*, 818 F.3d 1194 (11th Cir. 2016) ........................................................................... 13

*Arias v. Herzon*, 150 F.4th 27 (1st Cir. 2025) ........................................................................ passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 1, 17

*Barry v. Anderson,* No. 22-3098, 2023 WL 8449246 (3d Cir. Dec. 6, 2023) ............................... 13

*Begin v. Drouin*, 908 F.3d 829 (1st Cir. 2018) ............................................................. 18, 21, 22, 23

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)* ...................................................................................................................................... passim

*Carlson v. Green*, 446 U.S. 14 (1980) ......................................................................................... 7

*Chicago Headline Club v. Noem*, 810 F. Supp. 3d 842 (N.D. Ill. Nov. 20, 2025) ...................... 25

*Ciolino v. Gikas,* 861 F.3d 296 (1st Cir. 2017) ...................................................................... 20, 24

*Coley v. Lucas Cnty.*, 799 F.3d 530 (6th Cir. 2015) ..................................................................... 24

*Correctional Services Corp. v. Malesco*, 534 U.S. 61 (2001) ...................................................... 13

*Davis v. Passman,* 442 U.S. 228 (1979) ........................................................................................ 7

*Doan v. Bergeron*, No. 15-11725, 2016 WL 5346935 (D. Mass. Sept. 23, 2016) ...................... 14

*Egbert v. Boule*, 596 U.S. 482 (2022) ................................................................................... passim

*Enriquez-Perdomo v. Newman*, 149 F.4th 623 (6th Cir. 2025) ............................................... 12, 13

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................................. 17

*Hernandez v. Causey*, 124 F.4th 325 (5th Cir. 2024) ................................................................... 13

*Hernandez v. Mesa,* 589 U.S. 93 (2020) ...................................................................................... 10

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...................................................................................... 19, 22

*Hornof v. United States*, 107 F.4th 46 (1st Cir. 2024) .................................................................. 13

*Howe v. Town of N. Andover*, 854 F. Supp. 2d 131 (D. Mass. 2012) .................................... passim

*Hussen v. Noem*, 822 F. Supp. 3d 944 (D. Minn. 2026) ............................................................... 17

*Irish v. Fowler*, 979 F.3d 65 (1st Cir. 2020) ..................................................................... 22, 23, 25

*Jackson v. Tellado*, 236 F. Supp. 3d 636 (E.D.N.Y. 2017) .......................................................... 24

*Kidd v. Mayorkas*, 645 F. Supp. 3d 961 (C.D. Cal. 2022) ........................................................... 14

*Krueger v. Phillips*, 154 F.4th 1164 (10th Cir. 2025) .................................................................. 23

*Lachance v. Town of Charlton*, 990 F.3d 14 (1st Cir. 2021) .......................................... 17, 18, 20

*Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009) .................................................................. 17

*Marbury v. Madison*, 1 Cranch 137 (1803) ................................................................................. 7

*McCue v. City of Bangor*, 838 F.3d 55 (1st Cir. 2016) .................................................. 18, 19, 22, 23

*Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) .................................................. 11, 12, 14

*Morelli v. Webster*, 552 F.3d 12 (1st Cir. 2009) ......................................................................... 6, 14

*Nolan v. Krajcik*, 384 F. Supp. 2d 447 (D. Mass. 2005) ............................................................... 19

*Pagan-Gonzalez v. Moreno*, 919 F.3d 582 (1st Cir. 2019) ........................................................... 12

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................................................ 17

*Quinones-Pimentel v. Cannon,* 85 F.4th 63 (1st Cir. 2023) ...................................................... 9, 13

*Raiche v. Pietroski*, 623 F.3d 30 (1st Cir. 2010) ................................................................ 20, 21, 23

*Renzullo v. Town of Wakefield*, No. 20-11961-DJC, 2023 WL 2276821 (D. Mass. Feb. 28, 2023) ........................................................................................................................................... 23

*Rodríguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49 (1st Cir. 2013) ............................................. 1

*Smith v. City of Holyoke*, No. 17-30078, 2020 WL 1514610 (D. Mass. Mar. 30, 2020) ............. 22

*Snowden v. Henning*, 72 F.4th 237 (7th Cir. 2023) ..................................................................... 8

*Soldevila v. Sec'y of Ag.*, 512 F.2d 427 (1st Cir. 1975) ................................................................ 6

*Tun-Cos v. Perrotte*, 922 F.3d 514 (4th Cir. 2019) .................................................................... 12

*Tuuamalemalo v. Greene*, 946 F.3d 471 (9th Cir. 2019) .............................................................. 24

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) .................................................................. 24

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ................................................................................. 13, 15

## Statutes

8 U.S.C. §§ 1226, 1357(a)(4)-(5) ................................................................................................ 15

18 U.S.C. § 113(b)(4) ........................................................................................................ 2, 19, 25

28 U.S.C. § 2675(a) ..................................................................................................................... 25

42 U.S.C. § 1983 .......................................................................................................................... 6

M.G.L. Ch. 265, § 15D ........................................................................................................ 2, 19, 25

## Other Authorities

U.S. Dept. of Homeland Sec., Policy Statement 044-05 (Rev. 1), *Update to the Department Policy on the Use of Force* (Feb. 6, 2023) ............................................................................ 24

The Amended Complaint alleges that Agent David Jackson used deadly force against Carlos Zapata Rivera while arresting him in Fitchburg, Massachusetts, even though Carlos was restrained and presented no threat to anyone.  This is the *Bivens* heartland, and there is no qualified immunity for such conduct.  The fact that Agent Jackson is employed by U.S. Immigration and Customs Enforcement ("ICE") does not alter this analysis.  The First Circuit has allowed *Bivens* claims against ICE agents to proceed in the past, and affirmed the continuing viability of *Bivens* Fourth Amendment excessive force claims just last year.  The motion to dismiss should be denied.

## LEGAL STANDARD

A complaint may only be dismissed under Federal Rule of Civil Procedure 12(b)(6) if the complaint fails to state a claim to relief that is plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In deciding a motion to dismiss, a court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *Rodríguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 52-53 (1st Cir. 2013).  "While the defense of qualified immunity sometimes can be raised and evaluated on a motion to dismiss, it is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity, and courts often evaluate qualified immunity at the summary judgment stage." *Aaron v. City of Lowell*, 666 F. Supp. 3d 102, 122-23 (D. Mass. 2023) (internal citation omitted) (collecting cases).

## FACTS ALLEGED

In summary, the Amended Complaint alleges that Agent Jackson unlawfully used deadly force against Carlos by strangling him unconscious on the side of the road during an arrest in

1

Massachusetts last November.  This unjustified violence supports a Fourth Amendment claim under *Bivens*, and there will be no qualified immunity.

  1. *Carotid restraints are deadly force.*

  The Amended Complaint alleges that carotid restraints are a well-recognized form of deadly force.  *See* Am. Cmplt. ¶¶16-27.  The carotid arteries are blood vessels on either side of the neck that transport about 70% of the blood supply to the brain.  *See id.* ¶¶19-20 & Fig. 1.  Compression of the carotid arteries—referred to as a "carotid restraint"—is very dangerous.  *See id.* ¶¶19, 23.  A force of only 6 kilograms (about 13 pounds) can compress the carotid arteries, and this interruption in blood supply can result in loss of consciousness in as little as four seconds.  *See id.* ¶¶21-22.  Carotid restraints may cause brain damage, stroke, seizure, cardiac arrhythmia, damage to the blood vessels of the neck, and death.  *See id.* ¶¶23-25.

  ICE and the U.S. Department of Homeland Security have long classified carotid restraints (and other neck restraints) as a form of deadly force.  *See id.* ¶¶26-27.  The American Academy of Neurology also classifies carotid restraints and other neck restraints as a form of deadly force.  *See id.* ¶25.  State and federal law classify carotid restraints as crimes of strangulation.  *See id.* ¶17 (citing M.G.L. Ch. 265, § 15D and 18 U.S.C. § 113(b)(4)).

  2. *Agent Jackson used deadly force against Carlos while arresting him at a roadside vehicle stop in Fitchburg, Massachusetts, even though Carlos was restrained and presented no threat to Agent Jackson or any other person.*

  Carlos and his family posed no threat to anyone.  *See* Am. Cmplt. ¶¶30-66.  On November 6, 2025, Carlos was driving his wife Juliana to work in Fitchburg, Massachusetts, with their then-one-year-old daughter in the car.  *See id.* ¶¶30-31.  A group of federal agents (ICE agents and other federal agents working on behalf of ICE) activated their lights behind Carlos.  *See id.* ¶32.  Carlos pulled over to the side of the road, and the federal agents blocked in his car.  *See id.* ¶¶33-34.  The

federal agents then began banging on the windows of Carlos's car. *See id.* ¶35. The purpose of the stop was to arrest Juliana for civil immigration detention.[1] *See id.* ¶32.

Carlos and Juliana indicated they wished to be compliant. *See id.* ¶¶37-41. Carlos rolled down his window to speak with the agents. *See id.* ¶37. Juliana rolled down her window to speak with the agents. *See id.* ¶38. When an ICE agent ordered Juliana to open her door, she did so. *See id.* ¶39. When an ICE agent told Juliana that they intended to arrest her, Juliana informed them that she intended to comply, but first wanted to call her attorney to confirm what was happening. *See id.* ¶40-41.

However, rather than allow Juliana to call her lawyer, the ICE agents began various forms of coercion against the family. *See id.* ¶¶42-45. ICE agents physically grabbed Carlos and Juliana's young daughter. *See id.* ¶43. They climbed into the backseat of Carlos's car and began to restrain him and use force against him from behind and through the open front driver's side door. *See id.* ¶45. They began making threats that they would arrest both Juliana and Carlos, that their daughter would go to state custody, and that they would never see their daughter again. *See id.* ¶42. Carlos and Juliana were terrified that they were about to be permanently separated from their one-year-old child. *See id.* ¶44. At some point, Agent David Jackson arrived on the scene, and he and the other federal agents did, in fact, decide to arrest Carlos. *See id.* ¶¶46-48.

In the course of arresting Carlos, Agent Jackson strangled him unconscious in the front seat of his car. *See id.* ¶¶49-66. Other federal agents first restrained Carlos's arms from the back seat and through the drivers' side door. *See id.* ¶49. After confirming they were in place, Agent Jackson climbed in the front passenger's side door and positioned himself on top of Juliana and

---

[1] The government argued later that Juliana's arrest was required by the recently enacted Laken Riley Act, but then abandoned that assertion during habeas corpus proceedings in federal court. *See Am. Cmplt.* ¶71. A federal judge ordered Juliana's release just days after her arrest. *See id.*

their daughter so that he could reach Carlos. *See id.* ¶50.  Agent Jackson then used deadly force against Carlos.  *See id.* ¶¶51-60.  Specifically, Agent Jackson performed a carotid restraint on Carlos by grabbing his neck with both hands and compressing Carlos's carotid arteries very forcefully with his thumbs. *See id.* ¶¶51-52.  Agent Jackson continued to apply this pressure even after Carlos lost consciousness and began to experience pronounced involuntary, seizure-like movements.  *See id.* ¶¶57-59.



*Amended Complaint Figure 6:*
*Agent Jackson, wearing black gloves, applies the carotid restraint to Carlos*

Agent Jackson used deadly force against Carlos even though there were no circumstances that warranted such violence. *See id.* ¶54.  Carlos did not present a threat to the agents or anybody else. *See id.*  Carlos was restrained by the federal agents holding down his arms.  *See id.* ¶¶49, 53.  Carlos posed no risk of escape, because his car was blocked in by the agents' vehicles, such that he could not drive away.  *See id.* ¶34.  Carlos could not even move his head and neck away from Agent Jackson due to the driver's seat headrest and structure of the car.  *See id.* ¶53.

When Carlos regained consciousness, he felt confused and disoriented.  *See id.* ¶61.  Agent Jackson used this opportunity to complete the arrest by extracting Carlos through the driver's side door, handcuffing him, and placing him in the rear of a government car.  *See id.* ¶¶62-63.  Despite Carlos's obvious physical reaction to the carotid restraint, Agent Jackson denied Carlos access to medical attention at the time of his arrest, even though EMS personnel with a gurney were close

4

by and ready to help. *See id.* ¶64.  Instead, Agent Jackson waved EMS away and told them that Carlos did not need assistance. *See id.* ¶ 64.  Carlos later was released at the scene. *See id.* ¶66. After being released, Carlos had a sharp headache and was in pain, and visited the emergency room for treatment for having been "choked around the neck." *See id.* ¶66-68.  Carlos experienced lasting pain, suffering, and emotional distress as a result of having been strangled by Agent Jackson. *See id.* ¶¶69-70.  This lawsuit followed. *See* Cmplt. (D.E. 1) & Am. Cmplt. (D.E. 21).

## ARGUMENT

1. *Mr. Zapata Rivera may bring a* Bivens *claim against a federal agent who used excessive force while making an arrest inside the United States.*

Agent Jackson principally argues that "Supreme Court precedent forecloses recognition" of Mr. Zapata Rivera's *Bivens* claim. *See* Mem. at 4.  Agent Jackson is wrong.  For more than 50 years, the Supreme Court and First Circuit have recognized that private individuals have a cause of action under *Bivens* against federal agents who violate the Fourth Amendment by using excessive force while making arrests inside the United States.  This case is no different.  The mere fact that Agent Jackson does not work for the exact same federal agency at issue in *Bivens* (the Federal Bureau of Narcotics, which no longer exists) does not create a new context or bar the claim.  The Fourth Amendment's prohibition on the use of excessive force while making arrests within the United States is the same for all federal agents and applies equally to Agent Jackson. In fact, just last year the First Circuit reaffirmed that *Bivens* remains a viable claim to challenge excessive force during a domestic arrest. *See Arias v. Herzon*, 150 F.4th 27, 29, 49-50 (1st Cir. 2025) (holding *Bivens* remedy remains available after *Egbert* and reversing district court's allowance of defendant agent's motion for summary judgment).

A. The *Bivens* cause of action is a longstanding, robust, and necessary protection against federal agents' use of excessive force during domestic arrests in violation of the Fourth Amendment to the U.S. Constitution.

One of the Fourth Amendment's bedrock protections is the prohibition on law enforcement officers' use of excessive force while making arrests inside the United States. *See, e.g.*, *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009) ("Our case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer."). When the arrest was made by state and local officials, this protection is enforced through 42 U.S.C. § 1983, which creates an individual cause of action for damages for unconstitutional conduct by state officials. *See* 42 U.S.C. § 1983 (liability for persons acting under color of the law of "any State or Territory or the District of Columbia). However, by its terms, § 1983 does not apply to federal officials who break the law while performing federal duties. *See, e.g.*, *Soldevila v. Sec'y of Ag.*, 512 F.2d 427, 429 (1st Cir. 1975). That gap in statutory coverage creates the potential for federal agents to violate the law with impunity—a particularly dangerous prospect when the law at issue is a constitutional prohibition on agents of our government using excessive violence against people inside our own country.

Thankfully, for more than 50 years, *Bivens* has filled this gap. The *Bivens* cause of action arises from the Supreme Court's 1971 decision in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*. *See* 403 U.S. 388 (1971). There, the Supreme Court held that "a federal agent acting under color of his authority gives rise to a cause of action for damages consequent to his unconstitutional conduct." *See id.* at 389. Specifically, the plaintiff Webster Bivens had been arrested in 1965 by "agents of the Federal Bureau of Narcotics acting under claim of federal authority." *See id.* Bivens filed a lawsuit alleging, among other things, that "unreasonable force was employed in making the arrest." *See id.* The defendants argued that such

6

claims were only actionable "in tort, under state law." *See id.* at 390. The Supreme Court rejected the defendants' contention as "an unduly restrictive view of the Fourth Amendment's protection against unreasonable searches and seizures by federal agents, a view that has consistently been rejected." *See id.* at 391. The Supreme Court explained that the Fourth Amendment cannot be bound by the limits of state law, but is rather "an independent claim both necessary and sufficient to make out the plaintiff's cause of action." *See id.* at 395. The Supreme Court further explained that the fact that "damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition," because "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *See id.* "'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'" *Id.* at 397 (quoting *Marbury v. Madison*, 1 Cranch 137, 163 (1803)). Thus, the Supreme Court held that the plaintiff was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." *See id.*

*Bivens* has never been overruled. *See Arias*, 150 F.4th at 33. Instead, the Supreme Court has expanded it twice beyond its original Fourth Amendment context. In 1979, in *Davis v. Passman*, the Supreme Court recognized a *Bivens* claim for sex discrimination in violation of the Fifth Amendment. *See* 442 U.S. 228, 249 (1979). And in 1980, in *Carlson v. Green*, the Supreme Court expanded *Bivens* again by recognizing a claim for denial of medical care to a prisoner in violation of the Eighth Amendment. *See* 446 U.S. 14, 18-19 (1980).

Courts have developed a two-step inquiry to determine whether a claim is permissible under *Bivens*. *See Arias*, 150 F.4th at 30. First, "a court must determine whether the plaintiff's claims arise in a 'new context' compared to one of the cases in which the Court already has

7

recognized a damages remedy under *Bivens*." *Id.* "If the context is not new, then the inquiry ends and the *Bivens* remedy may be asserted." *Id.* "If the context is new, then a court must move on to the second step" and determine "whether there are 'special factors counselling hesitation' in extending the *Bivens* remedy." *See id.* The extension of *Bivens* into "new" contexts is not foreclosed, although it has been deemed a "disfavored' judicial activity." *See id.* at 33.

Critically, not every factual or legal variation creates a "new" context for the *Bivens* analysis. *See id.* at 34. Only a variation that is "meaningful" will trigger a "new" context for a *Bivens* claim, and the fact that a difference "'must be meaningful [to trigger a new context] suggests that *some* degree of variation will not preclude a *Bivens* remedy.'" *See id.* (quoting *Snowden v. Henning*, 72 F.4th 237, 243-44 (7th Cir. 2023)). Thus, just last year in *Arias*, the First Circuit held that the following variations were *not* "meaningful" and therefore did *not* trigger a "new" context for a Fourth Amendment *Bivens* claim:

- The "presence of a warrant" for the arrest during which excessive force was allegedly employed did not create a "new" context, *see Arias*, 150 F.4th at 37-38, even though the original *Bivens* arrest was allegedly made without a warrant, *see Bivens*, 403 U.S. at 389;

- "[T]he fact that the allegedly excessive force took place in a parking lot" did not create a "new" context, *see Arias*, 150 F.4th at 38-39, even though the original *Bivens* arrest was made in a private home, *see Bivens*, 403 U.S. at 389; and

- The "post-*Bivens* enactment in 1988 . . . of an administrative mechanism for a lodging a complaint about misconduct by a federal law enforcement officer" did not create a "new" context for Fourth Amendment excessive force claims within the existing *Bivens* context, *see Arias*,150 F.4th at 40, even though the Supreme Court recently found this factor weighed against extension of *Bivens* into new contexts. *See Egbert v. Boule*, 596 U.S. 482, 497-98 (2022).

Consequently, in *Arias*, the First Circuit held that the context presented by the plaintiff's allegations was not "new" and reversed the District Court's "grant of summary judgment to the defendants on [the plaintiff's] excessive force claims." *See* 150 F.4th at 49-50. The claim at issue

8

there—the alleged use of excessive force by federal agents in violation of the Fourth Amendment during an arrest in shopping center parking lot, *see id.* at 30—is virtually identical to the claim here. This case does not present any "new" context.

In summary, *Bivens* remains a robust and viable claim, encompasses factual variations necessary to do practical justice to the promise of the Fourth Amendment, and permits the claim pled here. As the First Circuit explained in *Arias* when it rejected the defendants' overly narrow construction of *Bivens*: "[I]t is most doubtful that *Bivens*, *Davis*, and *Carlson* are tickets that may be used to reach a stop that is not already on the existing *Bivens* line of authority. But those tickets are not good only for those same three stops. They also may be used for additional stops on the same line that *Bivens*, *Davis*, and *Carlson* define." *See Arias*, 150 F.4th at 34.

> B. The *Bivens* cause of action is available here because Mr. Zapata Rivera's claim of excessive force by a federal agent during an arrest inside the United States is squarely within the existing *Bivens* context for Fourth Amendment claims.

Agent Jackson implicitly concedes that neither the Supreme Court nor the First Circuit has ever held that ICE agents are categorically excluded from potential *Bivens* liability.[2] And it is well established that federal agents are liable under *Bivens* if they violate the Fourth Amendment by using excessive force during an arrest inside the United States. *See Arias*, 150 F.4th at 29, 50. This case falls squarely within that existing *Bivens* context and should not be dismissed.

---

[2] Agent Jackson notably relies almost entirely on out-of-circuit cases that are not binding on this Court. In fact, in the *Bivens* section of his brief, Agent Jackson only musters *two* First Circuit cases to argue his position: *Arias* (which, as described above, actually supports the continuing viability of *Bivens* and Mr. Zapata-Rivera's position in this case), and *Quinones-Pimentel v. Cannon,* 85 F.4th 63 (1st Cir. 2023) (which, as described below, is inapposite because it found a new context triggered by, among other things, a novel Fourth Amendment claim that did not assert excessive force and the inclusion of federal prosecutors and private contractors as defendants).

i.    This claim is not foreclosed by *Hernandez* and *Egbert*.

First, Agent Jackson argues this claim is foreclosed by the Supreme Court's recent decisions in *Hernandez v. Mesa* and *Egbert v. Boule*. *See* Mem. at 6. Agent Jackson is wrong. Those two decisions—issued in 2020 and 2022, respectively—addressed the conduct of Border Patrol agents *at the border*, not the conduct of federal agents making arrests *inside* the United States. In *Hernandez*, a Border Patrol agent fired two shots across the border into Mexico, killing a 15-year-old child. *See* 589 U.S. 93, 97, 103, 108 (2020) (reasoning that the "cross-border shooting claims" presented a new context because the allegedly unconstitutional acts in the original *Bivens* case were carried out "in New York City," and declining to "extend[]" *Bivens* into the "field" of "border security"). In *Egbert*, a Border Patrol agent allegedly attacked a man at the "Smuggler's Inn," a property that straddles the border between the United States and Canada. *See* 596 U.S. at 486-89, 496 (noting the "property line actually extends five feet into Canada" and "Agent Egbert was several feet from . . . the border," such that "cross-border security is obviously implicated"). Whatever these cases may mean for *Bivens* claims arising from cross-border law enforcement activities, neither case involved an ICE agent, and neither held that *Bivens* is unavailable for claims against federal officials acting in the interior of the United States. The incident at issue here occurred in Fitchburg, Massachusetts, which is, of course, part of the interior of the United States, not the border. *Hernandez* and *Egbert* do not apply. *See Arias*, 150 F.4th at 33 (explaining that, after *Hernandez* and *Egbert*, "the *Bivens* remedy continues to exist" and "the cause of action recognized there remains available").

*Egbert* does not apply for another reason as well: its analysis related to the second step of the *Bivens* analysis (*i.e.*, whether to recognize a new context), not the first (*i.e.*, whether a context is "new"). In *Egbert*, the Ninth Circuit's underlying decision "conceded that [the border claim]

10

presented a new context for *Bivens* purposes, yet it concluded there was no reason to hesitate before recognizing a cause of action against [the defendant Border Patrol agent]."  *See* 596 U.S. at 494. It was that extension that the Supreme Court deemed "incorrect," *see id.*, and the Supreme Court was therefore "addressing only the second step of the *Bivens* analysis, not the first."  *See Arias*, 150 F.4th at 40; *see also id.* at 44-45 (explaining that "*Egbert* was itself decided at the second step of the analysis," and that *Egbert*'s "single question" language does not displace the need to conduct the traditional two-step inquiry).  Thus, while *Egbert* might say something about whether *Bivens* should be extended to a "new" cross-border context, it does not speak to whether a particular claim falls within the *Bivens* cause of action that "already exists."  *See id.* at 45.  For this additional reason, *Egbert* does not relieve Agent Jackson of liability under *Bivens*.

> ii.  <u>The fact that Agent Jackson works at a different federal law enforcement agency than the agents in *Bivens* does not preclude this claim.</u>

Second, Agent Jackson argues that *Bivens* does not apply because ICE agents making arrests inside the United States must be a "a new category of defendant" merely because they do not work at the exact same federal law enforcement agency at issue in *Bivens*.  *See* Mem. at 5-6. Agent Jackson is wrong.  The First Circuit has never confined *Bivens* only to the identical agency at issue in that original case, and in fact has allowed *Bivens* Fourth Amendment claims to proceed against a wide range of law enforcement officers acting under federal authority within the United States—including ICE agents.  For example, in 2015, in *Morales v. Chadbourne*, the First Circuit affirmed the denials of motions to dismiss and summary judgment filed by three defendant ICE agents who were the subject of Fourth Amendment *Bivens* claims.  *See* 793 F.3d 208, 223 (1st Cir. 2015).  Like most reported *Bivens* appeals in the First Circuit, the agents' arguments appear to have focused on qualified immunity, but the First Circuit ordered the case to continue without any suggestion that *Bivens* might be categorically inapplicable to ICE agents.  *See id.*  In 2019, the

11

First Circuit reversed dismissal of a Fourth Amendment *Bivens* claim against FBI agents without any apparent concerns.  *See Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 602 (1st Cir. 2019).  Similarly, in 2008, in *DeMayo v. Nugent*, the First Circuit held that *Bivens* claims were available against Massachusetts State Troopers acting as part of a federal task force.  *See DeMayo v. Nugent*, 517 F.3d 11, 13-14, 17 (1st Cir. 2008).  At least in this circuit, federal agents making arrests inside the United States plainly fall within *Bivens*.

Agent Jackson does not explain why being an ICE agent would make a "meaningful" difference here.  *See Arias*, 150 F.4th at 34.  This is a claim alleging excessive force during an arrest at a roadside vehicle stop inside the United States—a common activity for law enforcement officers of all types, with no unique connection to immigration, national security, or the border.  *See id.* at 35 (explaining that whether a difference is "meaningful" so as to trigger a new *Bivens* context is a "functional" inquiry focused on whether a variation "might alter the policy balance that initially justified the cause of action recognized in *Bivens*, *Davis*, and *Carlson*").  Although Agent Jackson points to four out-of-circuit authorities for the proposition that "circuit courts are uniform in holding that claims against ICE officers arise in a new context," *see* Mem. at 6, these are inconsistent with the First Circuit's history of applying *Bivens* to ICE agents, *see Morales*, 793 F.3d at 223, and the First Circuit's extensive analysis of *Bivens*'s continuing vitality in *Arias*.  Further, neither *Enriquez-Perdomo* nor *Tun-Cos* involved excessive force claims in the heartland of existing *Bivens*.  *See Enriquez-Perdomo v. Newman*, 149 F.4th 623, 635 (6th Cir. 2025) ("The crux of Enriquez-Perdomo's complaint is that she was arrested and detained, *even though* the ICE officers knew that she had DACA status . . . . In short, Enriquez-Perdomo's complaint is that the officers placed her in immigration detention without lawful basis under the federal immigration laws."); *Tun-Cos v. Perrotte*, 922 F.3d 514, 519, 520 (4th Cir. 2019) (no excessive force claim);

12

*see also Alvarez v ICE*, 818 F.3d 1194, 1199 (11th Cir. 2016) (prolonged detention claim) (cited in Def. Mem. at 8). Even the Sixth Circuit declined to adopt the Fifth Circuit's apparent assertion that *Bivens* bars *all* claims against ICE agents in *Hernandez v. Causey*. *Compare* 124 F.4th 325, 333-34 (5th Cir. 2024), *with Enriquez-Perdomo*, 149 F.4th at 635 ("[T]he Fifth Circuit appears to stand alone in reaching this broad conclusion."). *Barry v. Anderson* is an unpublished opinion and does not carry precedential weight even within its own circuit. *See* No. 22-3098, 2023 WL 8449246, at n.* (3d Cir. Dec. 6, 2023) (decision "does not constitute binding precedent").

Where the Supreme Court and First Circuit have relied on a "new category of defendant" as a "meaningful" distinction, the differences in the category were much more pronounced— usually because the defendants were (or included) private contractors, federal officials in charge of federal agencies, and/or federal prosecutors. For example, in *Egbert*, the Supreme Court cited two cases for the proposition that a "new category of defendants" could trigger a new context. *See* 596 U.S. at 492. Those were *Correctional Services Corp. v. Malesco*, a case against a private corporation contracted by the government, *see* 534 U.S. 61, 64-65 (2001), and *Ziglar v. Abbasi*, where the defendants were three senior government officials (the Attorney General, FBI director, and INS commissioner) and the warden and associate warden of a jail. *See* 582 U.S. at 129. Similarly, in 2024, in *Hornof v. United States*, the First Circuit found a new context where the plaintiffs were challenging detention onboard their own Liberian-flagged ship, and the defendants included three federal prosecutors, members of the Coast Guard, and border officials. *See* 107 F.4th 46, 65-66 (1st Cir. 2024). And in 2023, in *Quinones-Pimentel v. Cannon*, the First Circuit held that a Fourth Amendment *Bivens* claim presented a new context where the alleged actions (search and seizure based on warrants acquired using fabricated evidence) "differ[ed] entirely from those at issue in *Bivens*," and where defendants included "not just federal line-level investigative

13

officers (as was the case in *Bivens*) but also . . . federal prosecutors and private, corporate employees allegedly working for the government." *See* 85 F.4th 63, 71-73 (1st Cir. 2023).

Here, in contrast, the only defendant is a federal agent who was working in the field, and the alleged conduct (excessive force during an arrest) is on all fours with *Bivens*. *See* 403 U.S. at 389. The mere fact that Agent Jackson works for an agency other than the now-defunct Federal Bureau of Narcotics does not trigger a new context. *See, e.g.*, *Kidd v. Mayorkas*, 645 F. Supp. 3d 961, 970 (C.D. Cal. 2022) (holding Fourth Amendment *Bivens* claim against ICE agent could proceed, even after *Egbert*); *see also Arias*, 150 F.4th at 34-35; *Morales*, 793 F.3d at 223; *Doan v. Bergeron*, No. 15-11725, 2016 WL 5346935, at *9 (D. Mass. Sept. 23, 2016) (denying motion to dismiss *Bivens* claim against ICE field office director).

> iii. The *Bivens* claim is not foreclosed by any differences in the "statutory or other legal mandate".

Third, Agent Jackson argues that the context is "new" because Agent Jackson "operated under a different 'statutory or other legal mandate' than the officers in *Bivens*." Mem. at 7. Agent Jackson is wrong. The relevant "legal mandate" is the Fourth Amendment prohibition on the use of excessive force while making arrests in the United States. This mandate applies to all arrests, regardless of the underlying statutory justification. *See, e.g.*, *Morelli*, 552 F.3d at 23.

Indeed, the First Circuit rejected a nearly identical argument in *Arias*. *See* 150 F.4th at 37. There, the defendants had allegedly used excessive force in effectuating an arrest pursuant to a judicial warrant, as opposed to the warrantless arrest in the original *Bivens* case. *See id.* at 31, 37. The defendants argued that, because they had a different underlying reason for the arrest, they were acting under a "different legal mandate" and therefore the claim arose in a new context. *See id.* at 37. The First Circuit disagreed. *See id.* at 37-38. The court explained whatever power the defendants had to make the arrest, "it plainly does not provide a 'legal mandate' to use *excessive*

14

force." *See id.* at 37 (citing *Abbasi*, 582 U.S. at 139-40). "The use of excessive force in effectuating an arrest is equally excessive regardless of whether an arrest is made pursuant to a warrant," and consequently the First Circuit did not "see how the presence of a warrant here constitutes a meaningful difference from *Bivens*, given the nature of the claims at issue." *See id.* at 37-38. Here, too, whatever underlying authority Agent Jackson was relying upon to arrest Carlos, it did not, and could not, authorize excessive force (the subject of this claim) and thus would not constitute a "meaningful" difference to trigger a "new" context. *See id.*

Moreover, even if the presence or absence of a "new" context hinged on the specific statute used to justify the arrest (which it does not), it would be premature to dismiss the *Bivens* claim. ICE agents make arrests for a variety of purposes. *See, e.g.*, 8 U.S.C. §§ 1226, 1357(a)(4)-(5). The complaint does not allege what authority Agent Jackson purported to rely upon to arrest Carlos, Agent Jackson has never been required to testify on the subject (nor does he identify a statute or other legal basis in his brief), and Carlos has not had any opportunity to take discovery on the subject. If the specific legal authority relied upon by Agent Jackson to arrest Carlos is an issue of interest to the Court, it would be more fairly considered at the summary judgment stage with the benefit of a complete evidentiary record concerning what that authority supposedly was.

iv. The *Bivens* claim is not foreclosed by any "special factors".

Fourth, citing *Egbert*, Agent Jackson summarily asserts that this claim implicates "special factors" and therefore must present a "new" context. *See* Mem. at 8. Agent Jackson is wrong. As noted above, *Egbert*'s holding concerns the second step in the *Bivens* analysis, not the first. *See* 596 U.S. at 494. While "special factors" might factor into the Court's decision whether to extend *Bivens* to a new context, they do not necessarily trigger a "new" type of claim. *See Arias*, 150 F.4th at 40-42. For example, Agent Jackson cites the availability of administrative grievance

15

procedures as a "special factor," *see* Mem. at 9-10, but the First Circuit held in *Arias* after extensive analysis that those same procedures did *not* create a "new" context for claims otherwise within the existing scope of *Bivens* (*i.e.*, a claim that is not otherwise "new"). *See Arias*, 150 F.4th at 40-50. Similarly, Agent Jackson suggests adjudicating this claim would somehow interfere with the functioning of other branches of government. *See* Mem. at 8, 10-11. However, this is not a claim involving foreign affairs, national security, or border operations—it is a claim against a federal agent's constitutionally-prohibited violence while making a public arrest during a vehicle stop on a city street in central Massachusetts. Even assuming impact on other branches is a special factor in some situations, the impact on other branches *here* would be indistinguishable from *Bivens* itself, and thus cannot make the context "new". *See Arias*, 150 F.4th at 40 ("[W]e also do not see how allowing a damages action here would risk any more 'disruptive intrusion' into the 'functioning of other branches' than *Bivens* itself already permits."). As explained above, this claims falls squarely within an existing *Bivens* context, and so should not be dismissed.

> C. Even if lawsuits against ICE agents for excessive force during an arrest inside the United States present a new context for *Bivens* purposes, the Court should recognize a *Bivens* claim in this context.

Finally, even if this case introduced a "new context" for *Bivens* (it does not), the Court should recognize that new context. To be sure, the Supreme Court and First Circuit have been clear that recognition of new *Bivens* contexts is unlikely and generally disfavored. *See, e.g.*, *Egbert*, 596 U.S. at 491; *Arias*, 150 F.4th at 33. However, as described above, a cause of action here would not implicate any concerns beyond those inherent in the existing *Bivens* excessive force context. And, more fundamentally, *Bivens* exists for "deterring the unconstitutional acts of individual officers" and "prevent[ing] constitutional violations from recurring." *See Egbert*, 596 U.S. at 498. ICE's widespread, repeated, and egregious violations of the U.S. Constitution over

16

the past year and a half surely indicate that further deterrence is necessary.  *See, e.g.*, *Hussen v. Noem*, 822 F. Supp. 3d 944, 955-998 (D. Minn. 2026).

> 2.  *Agent Jackson is not entitled to qualified immunity for strangling a restrained person unconscious without cause and in violation of his own agency's use of force rules.*

Qualified immunity also does not provide a basis for dismissal of the complaint.  Qualified immunity shields government officers from liability only when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, courts apply a two-prong test, asking "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Pearson*, 555 U.S. at 815-16). The doctrine is designed to protect government officers from meritless suits, and at the same time, ensure the public is able "to hold public officials accountable when they exercise power irresponsibly." *See Pearson*, 555 U.S. at 231. Carlos has pled sufficient facts to plausibly allege a Fourth Amendment violation and that his right to be free from excessive force was clearly established at the time.  Agent Jackson's motion to dismiss should be denied.

> A.  Because Agent Jackson used deadly force while Carlos presented no threat and was restrained, Carlos has sufficiently alleged a violation of the Fourth Amendment's prohibition on the use of excessive force.

To plead a plausible excessive force claim, a plaintiff must plead sufficient facts to allow the court to plausibly infer that the force used was objectively unreasonable.  *See Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021); *Iqbal,* 556 U.S. at 678 (claim to relief need only be plausible). Whether force is unreasonable requires considering the totality of the circumstances, in particular "(1) the severity of the crime at issue, (2) whether the suspect pose[d]

17

an immediate threat to the safety of the officers or others, and (3) whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks omitted).  However, "[t]he law in this circuit has long been clear that the use of deadly force ... is reasonable (and, therefore, constitutional) only when at a minimum, a suspect poses an immediate threat to police officers or civilians."  *Begin v. Drouin*, 908 F.3d 829, 834 (1st Cir. 2018) (quotations marks omitted).

Here, the Amended Complaint alleges that Agent Jackson used force that was obviously excessive: Carlos was not a threat to anybody, yet Agent Jackson deployed deadly force and strangled Carlos unconscious while other agents held him down.  *See, e.g.*, *id.* at 834; *McCue v. City of Bangor*, 838 F.3d 55, 59-60, 63-65 (1st Cir. 2016) (employing a neck restraint is excessive when plaintiff posed no threat).  Nevertheless, in his motion to dismiss, Agent Jackson makes three arguments that the force alleged in the Amended Complaint could not have been excessive as a matter of law: (1) that he did not use a "carotid hold," (2) that the use of force did not occur at the outset of the stop, and (3) that strangulation was justified because a video available online purportedly shows Carlos was "interlocked" with his wife or was holding her shirt while Agent Jackson choked him.  *See* Mem. at 13-19.  Each of these arguments fails.

First, Agent Jackson argues that Carlos cannot prevail because Agent Jackson employed a "pressure point technique," as opposed to a "carotid restraint" (apparently on the basis that Agent Jackson compressed Carlos's neck with his hands and thumbs, rather than his forearm).  *See* Mem. at 13-16.  This distinction in labelling is contrary to the allegations of the Amended Complaint, which allege a "carotid restraint" involving purposeful compression of Carlos's carotid arteries, a "very dangerous" type of force that may cause death and has been deemed "deadly force" by the world's largest association of neurologists.  *See* Am. Cmplt. ¶¶23-25, 51-52.  Nor is this proposed

18

distinction in nomenclature meaningful to the substantive analysis at this stage.  The Amended Complaint alleges that DHS's own standards group chokeholds, carotid restraints, strangulation techniques, and other neck restraints all together under the umbrella of deadly force.  *See id.* ¶27.  The criminal law calls them all strangulation.  *See* M.G.L. Ch. 265, § 15D; 18 U.S.C. § 113(b)(4).

In all events, what is at issue here is not the name used to describe Agent Jackson's conduct, but the conduct itself.  Agent Jackson grabbed Carlos's neck and put significant pressure on carotid arteries, a dangerous technique that can cause serious injuries and death.  *See* Am. Cmplt. ¶¶23, 51-52.  That deadly force—whatever named—was unconstitutional in the circumstances.  *See, e.g.*, *McCue*, 838 F.3d at 59-60, 63-65 (finding excessive force when officers put significant pressure on plaintiff's neck thereby restricting plaintiff's airflow because at that point, plaintiff was restrained and posed no threat); *Howe v. Town of N. Andover*, 854 F. Supp. 2d 131, 139-40 (D. Mass. 2012) (holding jury could find defendant used excessive force when he choked plaintiff after it was clear plaintiff was incapable of evading arrest and posed no threat to anyone); *Nolan v. Krajcik*, 384 F. Supp. 2d 447, 468 (D. Mass. 2005) (denying summary judgment for defendant officer who placed plaintiff in chokehold after removing him from a public meeting for disorderly conduct, because the evidence could support finding that the force used was not reasonable to restrain the plaintiff under the circumstances.).  To the extent Agent Jackson wishes to argue— contrary to the Amended Complaint—that he was engaged in some other form of contact, or that his contact did not compress either or both of Carlos's carotid arteries, these are factual disputes that must be reserved for summary judgment and/or trial.  *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, *if true*, establish a constitutional violation." (emphasis added)).  At the motion to dismiss stage, the Amended Complaint's allegations are presumed to be true, and

19

factual disputes regarding the precise nature and physical harm caused by the hold used by Agent Jackson must be resolved in Carlos's favor.

Second, Agent Jackson argues that Carlos's Fourth Amendment claim fails because the use of force was not immediate upon initiation of the stop, but rather occurred after Carlos had been stopped for some time. *See* Mem. at 16-17.  This makes little sense—regardless of how long the stop was, Carlos was never a threat to anybody, *see* Am. Cmplt. ¶¶53-54, and so there was no justification for strangling him unconscious.  *See Howe*, 854 F. Supp. 2d at 139-40.  And if the length of time was a material factor, its significance would at least be a jury issue: a jury might find the force excessive in part because Agent Jackson arrived in the middle of the stop and close in time to his use of force, *see Raiche v. Pietroski*, 623 F.3d 30, 39 n.3 (1st Cir. 2010) (immediacy of force may support a finding of unreasonableness), or might find the force excessive in part because Agent Jackson had adequate time to consider the situation and was not called upon to make any "split-second" decisions, *see Ciolino v. Gikas,* 861 F.3d 296, 304 (1st Cir. 2017) (finding force unreasonable in part because defendant officer was not forced to make a split-second judgment).  Certainly no inferences can be drawn *against* Carlos at the Rule 12 stage, however.

Third, Agent Jackson argues the use of force was justified because Carlos was "effectively thwarting arrest through resistance" by being "enmeshed in the front seat." *See* Mem. at 15-18. This is not an allegation of the Amended Complaint.  But even if true, whether Agent Jackson's use of force was permissible still turns on reasonableness, and nothing in the Amended Complaint indicates the use of deadly force like strangulation was reasonable. *See Lachance*, 990 F.3d at 20 (courts must analyze the totality of the circumstances).  For one thing, Carlos posed no threat to anyone.  Am. Cmplt. ¶¶53-54.  There is no allegation that he was armed or attacked anyone.  He was sitting in a parked car that was blocked in, he was surrounded on all sides by armed agents,

20

and (at the time of the restraint) he was actively being held down by those agents. *See* Am. Cmplt. ¶¶33-34, 36, 45, 49; *Raiche*, 623 F.3d at 37 (finding no threat when an individual remained with his vehicle, displayed no weapons, and made no threats). The lack of threat is especially relevant here because deadly force—as used by Agent Jackson—is reasonable only when a suspect "poses an immediate threat to police officers or civilians." *See Begin*, 908 F.3d at 834.  Carlos posed no threat to anyone.

Agent Jackson also points to an online video to claim that "a carotid restraint was not used here" and that Carlos was "gripping his wife's clothing" while Agent Jackson's hands were on his neck. *See* Mem. at 17-19.  There are, in fact, many videos of the stop and arrest, some taken by bystanders, others by police body cameras, and likely others by federal agents' body cameras. These will no doubt be the subject of discovery in both directions.  The Amended Complaint includes stills from a video showing both of Agent Jackson's hands on Carlos's neck.  *See* Am. Cmplt. Fig. 6.  It is candidly unclear to undersigned counsel how the online video referenced in the Motion to Dismiss could be helpful to Agent Jackson in rebutting that image.  The online video shows the later events alleged in Paragraphs 58 and 59 of the Amended Complaint when Carlos had already lost consciousness and was experiencing pronounced involuntary, seizure-like movements, while Agent Jackson continued to apply the carotid restraint with one hand.  The fact that a single 30-second online video clip does not depict the *entire* interaction alleged is hardly a basis to disregard the other allegations of the Amended Complaint or dismiss the case at this preliminary stage—at most, the video could raise questions to be addressed at summary judgment or trial on a fully developed factual record.  If anything, the fact that Carlos started violently convulsing after Agent Jackson strangled him—as clearly depicted in the video—further indicates that the force was excessive.  *See Smith v. City of Holyoke*, No. 17-30078, 2020 WL 1514610, at

*7 (D. Mass. Mar. 30, 2020) (explaining that "the nature and degree of [plaintiff's] injuries suggest that more force may have been applied than necessary"). And certainly, even if Carlos was holding his wife at the time, nothing in the video suggests Carlos presented a threat to anybody that would justify the application of deadly force. *See Begin,* 908 F.3d at 834. Carlos has clearly pled facts that, taken as true, could establish that Agent Jackson violated Carlos's Fourth Amendment rights.

          B.  Officer Jackson violated a clearly established right when he strangled Carlos unconscious.

Agent Jackson's bid for qualified immunity also fails because he violated Carlos's clearly established Fourth Amendment right. Whether a right was clearly established turns on "whether the state of the law at the time of the defendant's conduct gave them fair warning that their alleged treatment of the plaintiffs was unconstitutional." *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) (quoting *Hope*, 536 U.S. at 741). To make that determination, courts ask (1) "whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right," and (2) "whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *McCue*, 838 F.3d at 63.

As to the first prong, a violation is clearly established when it is "dictated by controlling authority or a robust consensus of cases of persuasive authority," which may include cases from sister circuits. *Irish*, 979 F.3d at 76. And while the right must be established with the appropriate level of specificity, a plaintiff need not cite to a case with the same set of facts, *id.*; as long as the defendant "had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive." *McCue*, 838 F.3d at 64; *see also Krueger v. Phillips*, 154 F.4th 1164, 1196 (10th Cir. 2025) ("[E]ven in excessive force cases, this court's analysis is not a scavenger hunt for prior cases with precisely the same facts.") (internal citation omitted)).

22

As an initial matter, "[t]he law in this circuit has long been clear that the use of deadly force is reasonable (and, therefore, constitutional) *only when* at a minimum, a suspect poses an immediate threat to police officers or civilians." *Begin*, 908 F.3d at 834 (emphasis added). As previously discussed, Carlos posed no threat to Agent Jackson, any other agent, or anyone else present that morning in Fitchburg. Indeed, Agent Jackson's use of force is all the more egregious because it was so obvious that Carlos posed no threat. *See Raiche*, 623 F.3d at 38 (noting that when a violation is "obvious," a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful); *Irish*, 979 F.3d at 76 ("[T]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation). Agent Jackson does not even attempt to argue that Carlos posed a threat—which would be necessary to justify his use of force—because such an argument would be far beyond the pale.

When courts in the First Circuit and elsewhere have confronted the specific use of neck restraints, they have repeatedly found the conduct to be unlawful when used against individuals who did not pose a threat. For example, in *McCue v. City of Bangor*, the First Circuit denied qualified immunity to defendant officers who knelt on plaintiff's neck therefore restricting airflow, even though plaintiff posed no threat because his legs were tied. 838 F.3d 55 at 59-60, 63-65; *see also Howe,* 854 F. Supp. 2d at 139-40, 143 (denying qualified immunity where defendants' conduct dangerously threatened blood flow to plaintiff's brain); *Renzullo v. Town of Wakefield*, No. 20-11961-DJC, 2023 WL 2276821, at *7, 13 (D. Mass. Feb. 28, 2023) (same).

Looking to other circuits, there is robust consensus that the use of a chokehold on a restrained person who does not present a threat violates the Fourth Amendment. *See Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019); *see also Coley v. Lucas Cnty.*, 799

23

F.3d 530, 540-41 (6th Cir. 2015); *Jackson v. Tellado*, 236 F. Supp. 3d 636, 664–65 (E.D.N.Y. 2017) (collecting cases and denying qualified immunity to an officer who choked plaintiff as he was trying to help another officer up from the ground because "[i]t is clearly established that a police officer cannot use a chokehold on someone who does not pose a threat of any kind."). In sum, in November 2025, it was clearly established that strangling Carlos, who posed no threat and was restrained, was unlawful.

Beyond being clearly established in case law, the fact that Agent Jacksons's conduct went against DHS and ICE's own use of force policies further supports that Agent Jackson had "fair notice" that his conduct was unlawful. In analyzing excessive force, courts have often looked to training and policies, finding that officers should have known better when their conduct conflicted with their own trainings and policies. *See Ciolino*, 861 F.3d at 305-06 ("clearly established" finding was supported by the fact that the officer's actions went against his own training); *Howe*, 854 F. Supp. 2d at 143 (denying qualified immunity to defendants who used a chokehold when officers actively disregarded their training on chokehold risks); *see also United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999) (upholding excessive force conviction for using a chokehold, emphasizing that police policy prohibited chokehold use).

Here, DHS policy expressly states that "[c]hokeholds and carotid restraints are prohibited unless deadly force is authorized," and that such techniques "must not be used as a means to control non-compliant subjects or persons resisting arrest." *See* "Update to the Department Policy on the Use of Force," Policy Statement 044-05 (Rev. 01), U.S. Dept. of Homeland Security (Feb. 6, 2023) at §§ III(C)(2), IV.B (quoted language cited in Am. Cmplt. ¶27). ICE also categorizes "any strangulation techniques" as deadly force. *See Chicago Headline Club v. Noem*, 810 F. Supp. 3d 842, 871 (N.D. Ill. Nov. 20, 2025) (quoting ICE directive) (cited in Am. Cmplt. ¶27). Considering

these facts, Agent Jackson clearly had fair warning that strangling Carlos when he posed no threat was unlawful. Indeed, Agent Jackson concedes that a "carotid hold is considered deadly force under DHS guidelines." Mem. at 13. And of course, deadly force was not, and could not have been, authorized against Carlos given the circumstances.

Lastly, even if it were not enough that the unlawfulness of Agent Jackson's conduct was clearly established in caselaw and his own agency's use of force policies, the criminality of Agent Jackson's conduct should have given him a fair and clear warning that his conduct was unlawful. "Strangulation" is a crime which prohibits conduct that impedes *circulation of blood by applying substantial pressure on the throat or neck* of another. *See* M.G.L. Ch. 265, § 15D (2014); 18 U.S.C. § 113(b)(4). That legislators saw it fit to criminalize Agent Jackson's actions further establishes that the conduct was "so objectively unreasonable and plainly misguided" that qualified immunity should not apply. *Howe*, 854 F. Supp. 2d at 143; *see Irish*, 979 F.3d at 76 ("clearly established" prong can be met when conduct is obviously unlawful, even absent relevant body of case law).

For all these reasons, Agent Jackson is not entitled to qualified immunity. Carlos has plausibly alleged that Agent Jackson violated his clearly established Fourth Amendment right to be free from excessive force. The Court should deny Agent Jackson's motion.[3]

## CONCLUSION

For all the foregoing reasons, Agent Jackson's motion to dismiss should be denied.

Respectfully submitted,

*/s/ Daniel L. McFadden*
Jessie J. Rossman (BBO # 670685)
Daniel L. McFadden (BBO # 676612)

---

[3] In late June, Carlos also presented the government with FTCA claims arising from this incident and the subsequent retaliation. *See* 28 U.S.C. § 2675(a). The administrative exhaustion process for those claims against the United States should be complete by the end of the year.

25

Ingrid Sydenstricker (BBO # 718298)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
dmcfadden@aclum.org

Ingrid S. Martin (BBO #653632)
Joseph M. Cacace (BBO #672298)
Todd & Weld, LLP
One Federal Street
Boston, Massachusetts 02110
Tel.: (617) 720-2626
imartin@toddweld.com
jcacace@toddweld.com

*Counsel for Plaintiff*

Dated: July 2, 2026

**Certificate of Service**

I, Daniel L. McFadden, hereby certify that the foregoing document will be electronically served
on all case participants through the Court's CM/ECF system.

Dated: July 2, 2026                 */s/ Daniel L. McFadden*
                                     Daniel L. McFadden

26